**SEALED**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-CR-20549 - MORENO

FILED BY____KP____D.C.

**May 27, 2022**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

UNITED STATES OF AMERICA,

      Plaintiff,

                                      **TO BE FILED UNDER SEAL**

vs.

 MARIO IVAN AMEZQUITA MERIDA

      Defendant.

_____/

### DEFENDANT'S SENTENCING SUBMISSION AND REQUEST FOR VARIANCE

The Defendant, Mario Amezquita Merida ("Mario"), by and through undersigned counsel, respectfully submits this memorandum pursuant to Rule 32 of the Federal Rules of Criminal Procedure and Title 18, United States Code, Section 3553(a) in connection with his sentencing, scheduled for June 7, 2022 at 10:00 a.m.  As an initial matter, the defense and the government concur with the conclusion in the Presentence Report that the appropriate adjusted advisory Guideline range in this case is a level 37, with a sentencing range of  to 210 to 262 months.   In this Memorandum, we set forth pertinent information regarding Amezquita's background and offense conduct which we believe warrant a substantial variance from the advisory Guidelines range, including: (a) Amezquita's extraordinary acceptance of responsibility;  (b) the absolute certainty (and in fact impossibility) of recidivism; (c) the conditions of his pretrial confinement as an immune-comprised prisoner during the Covid-19 outbreak ineligible for any of the benefits of the First Step Program; (d) his demonstrated efforts at rehabilitation, as shown by his

position at the Federal Detention Center ("FDC") and (e) his charitable contributions predating his arrest.

We further request that this Memorandum be filed under seal, as the public disclosure of the extent of Mario's cooperation poses a grave risk to him upon his return to Guatemala and the risk to his family residing in Guatemala.  Further, public disclosure could compromise ongoing government investigations and capture operations.

## FACTUAL BACKGROUND

### *A Childhood of Economic Hardship and Loss*

Mario was raised in Coatepeque, Guatemala, a town of approximately 37,000 people, near the border with the Mexican state of Tapachula.  He was raised in a very humble family, in lower economic circumstances.  Mario Anibal, Mario's father, worked as an ambulance driver for the hospital in Coatepeque for many years.  Eventually, Mario Anibal saved enough money to purchase a taxi; he worked at the hospital during the day and drove the taxi evenings and weekends.  After several years, Mario Anibal sold the taxi and purchased a small funeral parlor.  Mario Anibal supported not just Mario and his mother and brother; he also supported his own mother, nieces and sisters as Mario Anibal's own father had abandoned the family years earlier.

Mario's father suffered from chronic kidney disease which made the family's economic situation very unstable.  Many times, Mario Anibal was unable to work; when this happened, the family barely had enough to eat.  Mario did all that he could to assist his father, working as an errand boy, cleaning floors at the funeral parlor and helping prepare bodies for burial.  As soon as he obtained a driver's license, at age 14,  Mario

would drive his father to and from the hospital for kidney treatments, including dialysis; these treatments were only available in Guatemala City, five hours from Coatepeque.

In 1999, when both of his kidneys failed, Mario Anibal sold the funeral home, at that time, the family's sole source of income,  to pay for a kidney transplant.  Mario donated a kidney to his father in an effort to keep him alive.  Unfortunately, Mario Anibal died about four years later, leaving Mario, at age 23, responsible for supporting the entire extended family.

As Mario's mother notes in her letter to this Court:

My son Mario has always been an excellent son.  My husband was a sick man, with serious kidney problems.  When he was ill, he could not work.  We were poor and struggled financially for many years.  My husband tried hard to support us, working seven days a week, but his health always interfered.  Since he was a boy, Mario worked hard to help support us.  He would drive his father to and from his dialysis, a drive of more than five hours as the hospital where we lived would not help him. When my husband's kidneys failed, Mario donated a kidney to him.  Even before my husband died and certainly after, Mario took it upon himself to care for and support all of us.  I believe that it was my son's need to take care of all of us that led him to become involved in illegal activity.

See Exhibit A.

Mario graduated high school in approximately 1999 .  He received a scholarship which enabled him to attend university to study agronomy and engineering.  However, he was forced to leave university so that he could work full-time to help support his extended family.

Mario has always been a very hard worker, both by nature and by necessity.  While still in middle and high school, as noted above Mario worked as an errand boy and assistant at his father's funeral home in Coatepeque, Guatemala.  He assisted his father all throughout school and university.  After he was forced to leave university for economic reasons, Mario went to work for the Moscamed Program, an agricultural program funded

by the U.S. which is designed to eradicate agricultural pests, such a fruit flies, from Guatemala and Mexico, and prevent the spread of these pests north to the United States. Mario worked with this program for two years, from 2000 to 2002. Despite Mario's desire to continue in the field of his choice, the Moscamed Program did not pay enough for him to support his extended family so he was forced to resign.

In 2002, Mario opened a car wash in Coatepeque, Guatemala. He owned and managed the car wash until he sold it several years later. In approximately 2006, using money from the sale of the car wash, Mario opened a small nightclub in Coatepeque. The club closed in approximately 2011, as it was not successful. Mario later opened another nightclub in Coatepeque called La Fama. Eventually, Mario sold this nightclub to move to Guatemala City with his wife and young children, as there were better educational and economic opportunities in the city. In approximately 2018, Mario opened a business that cultivates, farms and exports shrimps. The company sells the shrimps within Guatemala and Mexico. He also has a smaller business that removes salt from the sea and sells it within Guatemala.

### *Marriage and Parenthood*

Mario married his first wife in 2000, when he was only 20 years old. Together, they had two children who are now adults. The marriage ended when Mario personally discovered his wife's infidelity, a tremendous shock as he was a loyal and devoted husband and father. While Mario supports the children from his first marriage, his ex-wife has made it impossible for him to have a real relationship with them. Mario and his first wife divorced in approximately 2008.

Mario began living with his current wife, Gabriela Claudette, in 2010; they married in 2014. Together, they have two young children, Fatima Valentina, age ten, and Jose Ignacio, age six. When they met, Gabriela had a young son, Eric Alfonso, now age 15, whose father had abandoned her and the child. Mario has raised Eric as his own son. Family is everything to Mario and, when he wasn't working, he spent all of his time with his wife, children and extended family. The family is extremely close; his wife and children were and remain very dependent on Mario both for emotional and financial support. As Mario's wife states in her letter to this Court:

> [Mario] has always been a man of values and a homebody. When we started together we lived in Coatepeque in the rural area, as it was very difficult to find a job, we came to the city in search of opportunities to improve, the beginning was hard, we suffered a lot of economic hardship. When our daughter Fátima was about to be born, we didn't even have enough for the delivery, my husband worked day and night to cover the medical expenses of the cesarean section.
> . . .
>
> When I started my relationship [with Mario], I was single and he showed us unconditional love, he was in charge of educating my son making him feel like his own and gave me the opportunity to have a beautiful family that I never expected . . . Mario gave himself with soul, body and heart to my son and raised him as his own son, making him a good person.

See Exhibit B.

Mario's five-year old son Jose Ignacio suffers from depression since his father was arrested and does not want to leave his mother's sight for fear that she too will be gone. Because of his age and vulnerability, Mario has not told his son that he is incarcerated; Jose Ignacio believes that his father that he is working in the United States. Recently, Jose Ignacio broke his arm and needed surgery; in the operating room, he cried constantly, saying where is my father, he said he would always be here for me. His ten-year old daughter Fatima Valentina was an excellent student before Mario's arrest; she

is now struggling with depression and her grades have suffered significantly.  Mario's

stepson Eric has decided that, with his father gone, he must be the man of the house,

putting himself under consider stress as he seeks to fill his father's role.  Attached as

Exhibit C are letters from the psychologist treating the children attesting to how difficult

Mario's incarceration has been for them.  As the therapist notes regarding Eric:

> The minor feels the absence of his father, since he perceived Mario as an ally, who advised him in relation to life issues (love, friends, and career). Now that Erik has battled with topics: alcohol, relationships and uncertainty about the future, he has noticed a decrease in his ability to resolve conflicts and creativity to find solutions. He considers that an emotional absence is worse than physical presence, so he would long to be with his father to be advised in this dimension.

See Exhibit C, Letter re: Eric.  Regarding Fatima, the therapist writes:

> [T]he quality of sleep of the minor has been damaged. She has begun to manifest anxiety through nightmares and insomnia (the protagonists are people who seek to harm her) she usually has thoughts in relation to being transgressed. . . .

See Exhibit C, Letter re: Fatima.  Finally, about Jose Ignacio, the therapist writes:

> Currently, Ignacio affirms that they used to be very close, they played together every afternoon, so the minor experiences it as a daily duel and recognizes this absence, he manifests it in disruptive behaviors, tantrums and tears triggered by neutral and very superficial situations.

See Exhibit C, Letter re: Jose Ignacio.

Both Fatima Valentina and Eric have written letters to this Court, detailing their

relationship with their father and the hole his incarceration has left in their lives.  Fatima

writes:

> I am Fatima Amezquita, I wrote this letter to be able to express to you about how I have felt since my daddy is gone and for you to know how much I miss him. My daddy is my favorite person and I really miss him a lot. I really need him he is the best dad, the best, the most affectionate and the one who was always there for me when something happened to me . . . . I miss the hugs he gave me and the movie afternoons next to him. I miss going out to the shops with him and buying my favorite candy.

<u>See</u> Exhibit D, Fatima Letter.  Eric writes:

> My name is Erik Suñiga and I am 16 years old.  From the day I was born my biological father was no longer with me because he separated with my mother, until my mother met Mario Amezquita whom I consider and will always consider my real father, the one who helped me start to read, to write, the one who helped me how to react when they bothered me either at school or when I went out to play with my friends, the one who gave me my first bicycle and taught me how to ride it . . . . At the moment that they arrested him . . . they arrested my soul, they arrested my desire to be someone, my mind could not process what was happening, I spent weeks depressed and to this day I can say that I am still with that depression. Five months after my father was arrested my grandfather passed away and it was one more blow to the wound that was already open.
>
> Dear Judge . . . I ask you with all my strength that at the moment of sentencing him, allow his human part to weigh more than the mistake he made, a mistake that he is totally sorry for, completely regrets and is learning the lesson that life is teaching him.

<u>See</u> Exhibit D.

At the time of his arrest, Mario was supporting his extended family with his

shrimp and salt businesses.  In addition to supporting his mother, wife and children,

Mario also supported his sister and her three young children, as his brother-in-law died

of cancer when Mario's sister was just 31 years old, as well as assisting his brother-in-

law, a single parent with a special needs child..  As his sister writes:

> Mario is a special brother he always has been looking out for me since I was a child, unfortunately I am a single mother, my husband died very young from cancer leaving me with alone with three young children to support,  he has always watched over my children and me so that we do not lack anything . . . Since he was very young, my brother has worked so that my mother and us do not lack anything. Always thinking about what to work in, since childhood. My father died years ago…Mario is so good and with a noble heart that he didn't mind donating a kidney so that our father would have a few more years of life.

<u>See</u> Exhibit E.

As Mario's brother-in-law writes:

He gave me a roof to live in and food when I started living here in the capital city while I was getting a job, without having the economic stability to help me . . . He

also insisted that I continue my studies, he helped me so that I could get my bachelor's degree. . . . I am a single father, my son's mother left him to me when he was 1 year old and my son suffers from convulsions and he uses a device of hoses and irons to be able to walk with his little legs and he supported me a lot with that and never asked for anything in return.

See Exhibit F.

Mario's brother continues to run the businesses and gives Mario's share of the profits to his wife and children; however, in Mario's absence, the business has suffered, and there is less income to support his extended family.

### *Mario's Poor Health*

Unfortunately, Mario is not a healthy man.   Because he donated a kidney to his father, he functions with only one kidney.  He suffers from very high blood pressure, which puts him at an elevated risk for stroke.  When he was first incarcerated at the FDC, despite multiple emails and calls from counsel, he did not receive his blood pressure medication at all; eventually, when he did receive medication, it was not at the proper dose, leading him to have crippling headaches.  Mario also suffers from severe GE reflux, irritable bowel syndrome, high cholesterol and asthma.  All of these pre-existing conditions make Mario an immune-compromised individual and put Mario at risk for serious complications from Covid.

### *Incarceration During the Covid-19 Pandemic*

As this Court is certainly aware, the Bureau of Prisons, much like the rest of society, was not prepared for a pandemic.  When Covid-19 hit the prison system, a sense of dread and fear pervaded the jail, as inmates got sick, some very sick, and some died. Every inmate has suffered during the pandemic with constant lockdowns, quarantines and Covid infections.

While incarcerated in Guatemala awaiting extradition, Mario tested positive for Covid.  He had all of the classic Covid symptoms – high fevers, chills, chest cough, congestion, loss of smell and taste, difficulty breathing.  He also had heart palpitations, an uneven heartbeat and rapidly fluctuating blood pressure.  Of course, for prisoners, there were no monoclonal antibodies or any other treatment, other than aspirin and over the counter cold medicine.  For almost three weeks, as Mario says in his own words:

> I tested positive for Covid a few days after I started to feel sick.  For ten days I was sicker than I have ever been in my life.  I had a high fever, a horrible cough, I couldn't breathe and I had awful neck pain.  I had difficulty urinating and had pain in my one remaining kidney.  I lost my sense of smell and taste and still have only a limited sense of smell.  When I arrived at the FDC, I got Covid again, though this time not nearly as bad as the first time.

See Exhibit G.

In addition to the health consequences of Covid in the jails, Mario as well as the other inmates suffered from the constant lockdowns related to Covid.  There was an initial two-month lockdown during which time he could not receive commissary and was only allowed out of his cell for two hours each day.   This was followed a few months later with another two-month lockdown with the same restrictions.  More recently, as a result of murders at a BOP facility in Texas, the entire jail was locked down for three weeks, during which time there was no commissary, no email or telephone calls and no legal visitation. These lockdowns affected Mario differently than many other inmates; he was unable to purchase the over-the-counter medications he needed from the commissary for extended periods of time.

### *The Origins of Mario's Involvement in Drug Trafficking*

Mario first became involved in drug trafficking when two friends he had met through his nightclub confided in him that they were traffickers and needed customers to buy their product.  At the time, Mario's nightclub was not doing well financially (he eventually had to close it) and he was supporting his children, wife and extended family.   Mario thought he would assist his friends with a one-time favor and make some money; instead, he found himself more and more enmeshed in the drug trade, eventually becoming a broker for loads.

## THE OFFENSE CONDUCT

The offense conduct charged in the Indictment to which Mario pleaded guilty relates to his role in trafficking from during a five-year period, from approximately 2014 to 2019.  As detailed in the factual proffer, during this time, Mario and his co-defendants were involved in the receipt in Guatemala of drugs coming from Colombia and other countries and the delivery or sale of some of those drugs to purchasers in Guatemala and Mexico, with the knowledge that the drugs would be imported into the United States.

## MARIO'S DECISION TO COOPERATE AND PLEAD GUILTY

Mario was arrested on February 12, 2021.  Almost immediately, he reached out to counsel and expressed a desire to cooperate.  From counsel's first visit with Mario at the jail in Guatemala until today, he has made every effort to atone for his conduct by cooperating.   While counsel does not seek credit for Mario's cooperation at this time, it is important to note that he did not hesitate but began cooperating almost immediately after his arrest and will continue to do so after his sentencing.

## LEGAL OVERVIEW

The opinion of the United States Supreme Court in <u>United States v. Booker</u>, 543 U.S. 220 (2005), made the Sentencing Guidelines advisory.  District courts must impose a sentence either within or outside the permissible guideline range after consideration of all permissible departures and variances.  District court judges exercise wide discretion in the types of evidence they may consider when imposing a sentence.  Sentencing courts are not to "presume that the Guidelines range is reasonable" and instead, "they must make an individualized assessment based on the facts presented."  <u>United States v. Gall</u>, 552 U.S. 38, 39 (2007).  The change occasioned by <u>Booker</u> has grown exponentially; thus, while a sentencing court will generally begin it its analysis with consideration of the relevant guidelines, it "**should**" entertain arguments from the parties as to whether a non-guidelines sentence is appropriate.  <u>Rita v. United States</u>, 551 U.S. 338, 351 (2007) (emphasis added).  Although the Guidelines are a starting point and initial benchmark, district courts must impose sentences within statutory limits based upon the appropriate consideration of all the factors listed in Section 3553(a) of the advisory Sentencing Guidelines.  <u>See</u> <u>United States v. Pepper</u>, 562 U.S. 476 (2011).

### THIS COURT SHOULD GRANT A SIGNIFICANT DOWNWARD VARIANCE PURSUANT TO SECTIONS 3553(a) and (b) OF THE GUIDELINES

As the Supreme Court has recognized, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  <u>Koon v. United States</u>, 518 U. S. 81, 113 (1996).  Application of the Section 3553 factors supports the conclusion that a substantial variance is warranted in this case.

### *Mario's Post-Arrest Conduct Demonstrates Extraordinary Acceptance of Responsibility, Warranting a Variance*

Where appropriate, courts may grant additional consideration to defendants who demonstrate acceptance beyond that necessary to obtain a two or three level reduction under § 3E1.1. This is so because such conduct bears directly on their character (§ 3553(a)(1)), and on how severe a sentence is necessary to provide deterrence and punishment, (§ 3553(a)(2)). While the Eleventh Circuit Court of Appeals has not explicitly approved a variance for extraordinary acceptance, it implicitly recognized the availability of such a variance in United States v. Kim, 364 F.3d 1235, 1240–41 (11th Cir. 2004). In Kim, the Court of Appeals affirmed that district courts have the authority to make an additional departure or grant a variance based on a defendant's extraordinary restitution. See United States v. Kim, 364 F.3d 1235, 1240–41 (11th Cir. 2004) ("We now join the Second, Third, Fourth, Sixth, Seventh, Eighth, and Ninth Circuits and hold that extraordinary restitution is not a prohibited factor"); see also United States v. Williams, 948 F.2d 706, 710–11 (11th Cir. 1991) ("A truly extraordinary post-arrest, pre-sentence recovery may . . . justify a downward departure . . .").[1]

Mario's conduct since the time of his arrest warrants a variance for extraordinary acceptance of responsibility. After his arrest in Guatemala, Mario waived every possible challenge to his extradition and, through Guatemalan counsel, asked that his extradition take place as quickly as possible. Through counsel, he provided information to the

---

[1] Judges in this very district have granted a variance for extraordinary acceptance of responsibility evidenced by immediate cooperation, see e.g. United States v. Geovanny Gomez Garcia, 18 CR 20458 (JEM), (court granted a 15-month variance, citing extraordinary acceptance of responsibility as evidenced by immediate cooperation ((Hon. Jose E. Martinez).

government for months before he was extradited.  Thus, we seek a variance for Mario's extraordinary acceptance of responsibility. [2]

### The Unlikelihood of Recidivism Warrants a Variance

The Supreme Court has recognized that the likelihood that a defendant will engage in future criminal conduct is a central factor that district courts must assess when imposing sentence.  See United States v. Pepper, 562 U.S. 476, 491 (citing 18 U.S.C. §§ 3553(a)(2)(B)-(C));  see also United States v. Jayyousi, 657 F.3d 1085, 1117 (11th Cir. 2011) (permitting the consideration of a defendant's risk of recidivism as a basis for departure in appropriate cases).  The extreme unlikelihood of recidivism — or more precisely, the virtual impossibility of recidivism — further justifies a variance in this case.

Mario has written this Court a letter (Exhibit F) accepting responsibility for his criminal conduct, candidly admitting that he became involved in drug trafficking for the financial reasons without thinking about the devastating effect of drug trafficking.  One of the factors which most strongly militates against recidivism is Mario's demonstrated determination to change his life, evidenced not merely by words but by actions in cooperating very shortly after his arrest.  Once he is sentenced and returns home, he does not need to resort to criminal activity to support himself and his family – he earns sufficient income from the shrimp and salt business to support them.   He is blessed with the support of his wife, his parents and his siblings, all of whom anxiously await his

---

[2] We do not seek a reduction for Mario's cooperation at this time as we expect the government to file a motion pursuant to Rule 35 of the Federal Rules of Criminal Procedure once Mario's cooperation is completed.

release; studies have shown that having family support and a job are crucial elements when preventing recidivism. [3]

Finally Mario could not return to the world of drug trafficking even if he were tempted.  During the course of his cooperation, with the government's authorization, Mario used the help of a former employee to obtain information for the government.  That employee promptly contacted the individuals about whom the government was inquiring to let them know that Mario was speaking about them.  Mario has now been "outed" as a cooperator.  Not only would he not be able to return to trafficking; he will likely face the prospect of retaliation when he returns to Guatemala and his family constantly worries about the prospect of retaliation at this very moment.

Thus, for personal and practical reasons, under no circumstances will Mario engage in drug trafficking or any other unlawful activity again.  The corollary to this conclusion is that an extended time in custody is not needed for specific deterrence, militating in favor of a variance.

### The Conditions of  Mario's Confinement During Covid and His Status as an Incarcerated Alien Warrants a Variance

As noted above, Mario is immune-comprised and suffers from a variety of health conditions.  Thus, the risk to his health from Covid is greater than that of the typical, healthy inmate.[4]  He has suffered through the on and off lockdowns which have made prison life more difficult than it already is.  During the lockdowns, he was unable to

---

[3] See Post-Release Employment Among Different Types of Offenders (Justice Policy Journal, Spring 2012, Volume 9) (strong employment history predictor for low rate of recidivism); Employment Dimensions of Reentry: Understanding the Nexus between Prisoner Reentry and Work, (May 2003) (same); The Impact of Marital and Relationship Status on Social Outcomes for Returning Prisoners (Urban Institute April 2009) (former prisoners who were married or living as married had half the likelihood of committing new crimes).

[4] Mario has had Covid twice while incarcerated.  Given the spread of new variants and the high infection rate in the U.S., especially in the prisons, he is at risk for yet another bout of Covid.

purchase medications at the commissary that he uses to control his sinusitis, allergies and reflux, further distinguishing the conditions of his confinement from other, healthy inmates.

Mario is a Guatemalan national without status in the U.S.  He is ineligible for more lenient confinement during the last 10% of his sentence, such as time in a half-way house, nor is he eligible for assignment to a minimum-security facility or camp and cannot work in the federal prison industries.[5]  He cannot take advantage of any of the new programs contained in the First Step Act to reduce his sentence.  He is unable to receive family visits; none of his family members have visas, nor are they able to obtain visas because of Mario's arrest.  Finally, at the conclusion of his sentence he will be sent to an immigration detention facility for an unspecified amount of time, while the United States arranges for his deportation to Guatemala.

The Eleventh Circuit has held that a sentencing court cannot grant a downward departure based on collateral consequences from a defendant's alienage, see  e.g., United States v. Canpaz, 276 Fed. Appx. 878, 881 (11th Cir. 2007).  However, in several cases, the Circuit has left open the possibility that these collateral consequences may be grounds for a variance; see United States v. Saac, 632 F.3d 1203, 1214 (11th Cir. 2012) (distinguishing but not deciding between a Court's pre- and post-Booker authority to consider the collateral consequences suffered by an incarcerated alien and upholding a sentence as reasonable); U.S v. Barker,  498 Fed. Appx. 942, 945 (11th Cir. 2012)(holding that the district court did not err when it denied a variance based on collateral consequences for alienage as the decision was not unreasonable).

---

[5] See BOP Program Statement # 7310.04, pp. 10-11; https://www.bop.gov/policy/progstat/5100_008.pdf

The Eleventh Circuit, along with other Circuits, has also recognized that a defendant's health conditions can be considered as grounds for a variance.  See e.g. United States v. Gray 453 F.3d 1323,1434 (11th Cir. 2006)(per curiam)(affirming a downward variance of 72 months as reasonable because of, among other things, the defendant's medical conditions; medical conditions are "are valid considerations because they relate to the 'history and characteristics of the defendant.'"); United States v. Rioux, 97 F.3d 648, 662 (2d Cir. 19966)( upholding downward departure based on a combination of factors including, kidney disease, bone disease and charitable acts).

A variance for the reasons stated above, including the fact that Mario will not see his family for many years and the serious risk to his already poor health from continued confinement, considered with the other grounds set forth in this memorandum, is therefore both permissible and warranted.

### *Mario's Charitable Acts Warrant a Variance*

Courts in Circuits throughout the United States have held that charitable contributions are a permissible ground for courts to consider when a defendant seeks a departure or variance.  See United States v. Paradies, (N.D. Ga. 1998)(combination of ill health, age and charitable contributions warranted a downward departure); United States v. Woods, 159 F.3d 1132, 1136-37 (8th Cir. 1998)  (exceptional charitable contributions are grounds for downward departure); United States v. Rioux, 97 F 3d. 648 (2nd Cir. 1996 (not abuse of discretion to downwardly depart based on community contributions and defendant's health issues); United States v. Takei, 941 F.2d 738, 744 (9th Cir. 1991) (outstanding good deeds are proper grounds for downward departure).

Mario is an extremely generous, charitable individual.  The letters contained in Exhibit G describing the charitable acts he performed, both for friends and strangers, show Mario's  true character.   When a poor neighbor contracted HIV, Mario paid for the medications she needed to survive.  When a school for lower income children needed uniforms so the children could play sports, Mario paid for the uniforms and equipment. He helped support reforestation programs to help turn the municipal landfill into a park. He donated his time and efforts working to help develop opportunities for advancement in poor, rural areas.  See Exhibit H.

At the beginning of the Covid outbreak in Guatemala, prior to his arrest, Mario went door to door in poor neighborhoods delivering food that he had purchased.   While in jail in Guatemala and now at the FDC, Mario has been generous with other, less fortunate inmates.  In Guatemala, if an inmate's family does not send food, the inmate doesn't eat. Mario would make sure that his wife Gabriela brought enough food for all of the inmates on his floor.

All of these charitable acts predated Mario's arrest; they were not done to curry favor with the Court.  They are the best demonstration of who Mario is as a human being. He sought neither thanks nor public accolades for his help; he took quiet satisfaction in knowing that he had bettered the lives of others less fortunate.  He helped others because it was the right thing to do.  Thus, we ask this Court for a variance for the good Mario did with the (albeit partially illicit) money he earned.

### *Mario's Demonstrated Post-Arrest Rehabilitation is Grounds for a Variance*

Counsel has represented many inmates who do not use their time in custody productively.  Mario is the very opposite. As noted above, Mario is a very hard worker.

Because of his impeccable behavior, he was rewarded with a position as orderly at the FDC, responsible for cleaning floors and bathrooms.  <u>See</u> Exhibit I.  Mario also helps less fortunate inmates become accustomed to the FDC, providing them with emotional support and sharing his commissary with them.  These rehabilitative efforts, coupled with his early cooperation, warrant a variance.

### *A Variance Is Warranted to Avoid Sentencing Disparity Within the District*

The Southern District of Florida has perhaps the most extensive experience of any judicial district in the United States with respect to the prosecution of international narcotics conspiracy cases, particularly those involving Guatemalans.  A review of those cases reveals that the judges in this district have repeatedly granted significant downward variances in cases involving extradited Guatemalan drug traffickers based upon the factors set forth in Title 18, United States Code, Section 3553(a).  These variances were unrelated to the defendant's cooperation with the United States.  A few examples of such cases follow:[6]

(1)     <u>United States v. Zelmar Borrayes</u>, 16-20101 (KMW), the defendant began at a level 33 with a range of 135-168 months.  The Court granted a 15-month variance on the grounds that the defendant was a first-time offender and had engaged in post-arrest rehabilitative conduct, with the understanding that the defendant would receive a  Rule 35 reduction. (Hon. Kathleen M. Williams);

(2)     <u>United States v. Manuel Felipe Arenales</u>, 16 -20374 (KMW), the defendant began at a level 33 with a range of 135-168 months.  The Court granted an 18-month variance on the grounds that the defendant was a first-time offender and had engaged in

---

[6] Transcripts for all of the cases referenced below are attached in Appendix B.

post-arrest rehabilitative conduct/super-acceptance of responsibility (meeting with the government prior to extradition) with the understanding that the defendant would receive a Rule 35 reduction. (Hon. Kathleen M. Williams);

(3)   United States v. Jorge Galdames, 16-20765 (MGC), the defendant began at a level 35 with a range of 168-210 months.  The Court granted a 16-month variance (while the Court did not specifically state the grounds, defense counsel argued for a variance based on the awful conditions of confinement, threats to the defendant's family and his conversion to Christianity) with the understanding that the defendant would receive a Rule 35 reduction. (Hon. Marcia Cooke)

(4)   United States v. Mynor Hidalgo, 15-20676 (UMU), the defendant began at a level 37 with a range of 210 to 262 months.  The Court granted a 30-month variance based on risk to family members resulting from the defendant's pre-extradition cooperation, with the understanding that the defendant might receive a Rule 35 reduction. (Hon. Ursula Ungaro);

(5)   United States v. Sebastiana Cotton, 14-20557 (MGC), the defendant began at a level 38 with a range of 235 to 293 months.  The Court granted a 15-month variance to reward defendant for waiving extradition, noting defendant's age and medical condition, with the understanding that the defendant would receive a Rule 35 reduction.  (Hon. Marcia Cooke) ;

(6)   United States v. Yaneth Vergara, 14-20557 (MGC), the defendant began at a level 38 with a range of 235 to 293 months.  The Court granted a 15-month variance to avoid sentencing disparity with a co-defendant (Sebastiana Cotton, see (5) above), with

the understanding that the defendant would receive a Rule 35 reduction. (Hon. Marcia Cooke);

(7)  United States v. Geovanny Gomez Garcia, 18-20458 (JEM), the defendant began at a level 33 with a range of 135 to 160 months.  The Court granted a 15-month variance, citing extraordinary acceptance of responsibility as evidenced by immediate cooperation, with the understanding that the defendant would receive a further Rule 35 reduction. (Hon. Jose E. Martinez); and

(8) United States v. Noe Esquivel, 17-20120 (FAM), the defendant began at a level 33 with a range of 135 to 160 months.  The Court granted a 15-month variance, citing the similar variance he had given to the co-defendant and the fact that the defendant had begun cooperating immediately. (Hon Federico A. Moreno).

Of note, Marlon Monroy, alias "Fantasma," (charged in U.S. v. Monroy, 16 – 20189), the individual under whose direction Amezquita worked and who clearly had a more significant managerial role than Amezquita, also received a two-level enhancement for role in the offense, stipulated to by the government.     See Presentence Report, paragraph 24 (Hon. Darrin P. Gayles).

In order to avoid significant sentencing disparity and achieve parity with similarly situated defendants, we ask this Court to grant a variance which reflects all of the above-mentioned factors.

## **CONCLUSION**

The Supreme Court has established that district courts should not hesitate to use their discretion in devising sentences that provide individualized justice.  Gall, 552 U.S.

at 59–60.  As Judge Leval of the Second Circuit stated so eloquently in <u>United States v.</u> <u>Core</u>, 125 F.3d 74  (2d. Cir. 1997):

> As the successful rehabilitation of a criminal is a valuable achievement of the criminal process, the question is what purpose will be achieved by further lengthy incarceration.

<u>Id</u>. at 78.

Narcotics trafficking is a serious crime, with serious consequences in both Guatemala and the United States.  Mario took the wrong path when he became involved in trafficking.  Motivated by a desire to change his life and protect his family, Mario began cooperating virtually immediately after his arrest.  A significant variance will allow Mario - a relatively young man with a young and supportive family who need him and a legitimate business to run - a second chance in life, a chance this time to choose only the correct path.

Dated: May 27, 2022

Respectfully submitted,

By:  */S/ Bonnie S. Klapper*
Bonnie S. Klapper, Esq.
51 Division Street #124
Sag Harbor, New York 11963
Email: bonniesklapper@bskesq.com

By:  */S/ Daniela Posada*
Daniela Posada
12889 Hyland Cir
Boca Raton, FL 33428
Fla. Bar #118384

## CERTIFICATE OF LIMITED SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has not been filed via CM/ECF.  A copy has been furnished by email this 27th day of May, 2022 to the following counsel of record: Shane Butland, AUSA, Office of the United States Attorney, 99 NE 4th Street, Miami, FL 33132.

By:  /S/ *Bonnie S. Klapper*
Bonnie S. Klapper, Esq.